UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHELSIE R. SMITH,

                  Plaintiff,           Civil Action No. 16-10492
                                            Honorable Nancy G. Edmunds
                                            Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [22, 26]

Plaintiff Chelsie R. Smith ("Smith") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [22, 26], which have been referred to this Court for a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B).

I.      **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Smith is not disabled under the Act between July 26, 2006 and November 2, 2010 is not supported by substantial evidence. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [26] be DENIED, Smith's Motion for Summary Judgment seeking remand for further consideration by the ALJ [22] be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED to the ALJ for further proceedings consistent with this R&R.

II.     **REPORT**

A.     **Procedural History**

On July 26, 2006, Smith filed an application for SSI, alleging a disability onset date of September 30, 1993.  (Tr. 61, 368, 718).  This application was denied at the initial level.  (Tr. 61).  Smith filed a timely request for an administrative hearing, which was held on May 28, 2008, before ALJ Paul Armstrong.  (Tr. 9-60).  Smith, who was represented by attorney Danelly Smith, testified at the hearing.  (*Id.*).  Her mother, Denise Smith, also testified, as did vocational expert ("VE") James Breen.  (*Id.*).  On June 27, 2008, the ALJ issued a written decision finding that Smith is not disabled under the Act.  (Tr. 64-76).  On April 21, 2010, the Appeals Council denied review.  (Tr. 3-7).

On April 28, 2010, Smith filed a subsequent application for Disability Insurance Benefits ("DIB") and SSI.  (Tr. 780).  On May 17, 2011, an ALJ issued a fully favorable decision, finding that Smith became disabled on November 3, 2010.  (Tr. 638, 780, 837, 860).  Based on this finding, Smith became eligible for SSI as of November 3, 2010.  (Tr. 837).  The Appeals Council neither affirmed nor reopened this decision.  (Tr. 780).

Still, on July 7, 2010, Smith timely filed for judicial review of the final decision denying her 2006 application for SSI.  (Tr. 761); (Civil Action No. 10-12691, Doc. #1).  On January 25, 2013, Magistrate Judge Mona K. Majzoub issued an R&R finding that Smith had shown "convincing evidence of actual bias or prejudgment on the part of the ALJ" and therefore recommended that Smith's Motion for Summary Judgment be granted in part and denied in part, that the Commissioner's motion be denied, and that the case be remanded to the Commissioner for further consideration by a different ALJ.  (Tr. 760-72).  On February 14, 2013, the

Commissioner filed an objection to the R&R, which Smith responded to.  (Civil Action No. 10-12691, Docs. #38, #39).

On March 1, 2013, the Honorable Nancy G. Edmunds determined that although the issue of bias in this case was a "close call," remand was appropriate due to the Commissioner's "failure to address the bias issue and the magistrate judge's reasoned explanation of its decision to remand."  (Tr. 774-77).  Accordingly, Judge Edmunds overruled the Commissioner's objection, adopted the R&R, and remanded the matter for redetermination with a different ALJ. (*Id.*).

On remand, the case was assigned to ALJ Ena Weathers, who held two administrative hearings:  one on June 11, 2014 (Tr. 702-12), and another on September 15, 2014.  (Tr. 713-45). No testimony was taken at the first hearing.  (Tr. 702-12).  At the second hearing, Smith, who was again represented by attorney Danelly Smith, testified, as did her mother, Denise Smith. (Tr. 713-45).  VE Pauline Pegram also appeared and testified.  (Tr. 740-44).  At this hearing, Smith amended her onset date to the application date of July 26, 2006.  (Tr. 638, 719, 984).  On October 24, 2014, ALJ Weathers issued a written decision finding that Smith was not disabled between July 26, 2006 and November 2, 2010.[1]  (Tr. 635-55).  On December 8, 2015, the Appeals Council found no reason to assume jurisdiction over the case.  (Tr. 629-33).  Smith timely filed for judicial review of the final decision on February 10, 2016.  (Doc. #1).  On June 27, 2016, Smith filed a Motion for Summary Judgment.  (Doc. #22).  The Commissioner filed a Motion for Summary Judgment on September 28, 2016 (Doc. #26), and Smith filed a reply on October 4, 2016.  (Doc. #27).

---

[1]  Upon reviewing the procedural history of this case, the ALJ found that the fully favorable decision issued by an ALJ on May 17, 2011 was "final and binding on all parties."  (Tr. 638).  As a result, her decision "addresses only the period from July 26, 2006, the amended onset date of disability, to November 2, 2010."  (*Id.*).

3

### B.    Framework for Disability Determinations

Under the Act, SSI benefits are available only for those who have a "disability."   *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec.

6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four

steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the

burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    Smith's Reports and Testimony

At the time of the administrative hearing on May 28, 2008, Smith was 20 years old.  (Tr. 719).  At 5'4'' tall, she weighed 150 pounds.  (*Id.*).  She lived in a house with her mother, father, and sister.  (Tr. 720).  Smith's highest level of education is high school, where she attended special education classes.[2]  (Tr. 140, 720).  Smith testified that five days a week she went to Arkay Southgate Crossing ("Arkay"), a vocational rehabilitation agency in Wayne County, Michigan.[3]  (Tr. 18, 24, 728).  (Tr. 728).  She did not know what type of vocational training she had received through Arkay.  (Tr. 720-21).

In 2008, Smith testified that she worked at a concession stand at Comerica Park during Detroit Tigers games, with the help of a job coach.[4]  (Tr. 20, 24-25).  She operated the cash register for the duration of each game and reported getting frustrated with it.  (Tr. 20, 24-25, 721).  She had previously done similar work at a concession stand in Ford Field, also with the help of a job coach.  (Tr. 724).  She got the jobs at Comerica Park and Ford Field through Arkay.  (Tr. 726).  In addition, she had worked as a dishwasher (Tr. 25) and for Liberty Tax as a sign holder and waver during tax season, which is approximately three months long.  (Tr. 19, 724-25).

---

[2] According to Smith's mother, Smith had speech delays and was in speech classes all through grade school.  (Tr. 38).  Her mother also indicated that in school, her tests were either made easier for her or administered to her orally.  (Tr. 158).

[3] Smith's mother testified that with all of her absences, Smith actually attends Arkay around three days a week.  (Tr. 732).

[4] Smith testified that for the jobs in which she had a job coach, she never went to those jobs by herself.  (Tr. 726-27).

She got the job at Liberty Tax through Arkay, and a job coach helped her with it.[5]  (Tr. 725).  She also worked at McDonald's mostly bagging food and cleaning because she was unable to work the cash register.[6]  (Tr. 136-37).  In 2014, she testified that through Arkay, she was working at T.J. Maxx "clean[ing] up the toys."  (Tr. 721).  She worked there for about four hours, once every month or two, and also with help from a job coach.  (Tr. 727).  Smith testified that she might not be able to work full time because she can't keep up with the pace.  (Tr. 721).

Smith alleges disability as a result of various mental conditions, including depression and a cognitive impairment that involves a learning disability, an educable mental impairment, and a low IQ.  (Tr. 136).  Her Disability Report indicates that she has low concentration and comprehension levels, as well as a low work-maturity level.  (*Id.*).  She can only do limited types of work, and gets upset or nervous if she is given tasks above her abilities (she will cry and want to go home).  (*Id.*).  The Disability Report also explains that her depression is "due to [her being] unable to fit into a regular daily life."  (*Id.*).  Smith takes Zoloft, and testified that she did not know if it was helping, but that it gives her no side effects.  (Tr. 140, 157, 722).

Smith testified that through Arkay, she participated in group activities in addition to working.  (Tr. 729).  For example, she went bowling, went to coffee shops, and walked around in stores like Walmart, Meijer, and Target.  (*Id.*).  She testified that someone affiliated with Arkay went to her house to teach her how to cook and do laundry.  (Tr. 730).

---

[5] According to Smith's testimony, this job coach was with her the entire time she was performing her job at Liberty Tax.  (Tr. 726).  In addition, the job coach would take her to the job and then back to Arkay.  (*Id.*).

[6] According to Smith's mother, Smith was overwhelmed and became upset when they tried to show her how to use the cash register, and she wanted to quit.  (Tr. 158-60, 166).  Apparently something similar happened when Smith worked at Wendy's.  (Tr. 53, 136).

Smith does house chores like cleaning her room, but does not go grocery shopping or cook.  (Tr. 723, 730).  In 2008, Smith said that she "[k]ind of" knew how to do laundry, but at her later hearing, she said she did laundry by herself.  (Tr. 27, 730).  On a typical day, Smith wakes up, brushes her teeth, takes a shower, eats cereal, and then goes to Arkay.  (Tr. 723).  She said she is at Arkay from 8:30 a.m. to around 2:00 p.m.  (*Id.*).  When she gets home, she watches television.  (*Id.*).  She also visits family and hangs out with friends.  (Tr. 723-24).

Smith has a driver's license and can drive alone.  (Tr. 21, 43, 720).  She took her driver's test orally.  (Tr. 43).  She can follow directions.[7]  (*Id.*).  In 2008, a van picked her up to go to work (*id.*), but in 2014, she drove herself to Arkay.  (Tr. 720).  Smith belongs to a bowling league but did not know her average.  (Tr. 21).  She plays floor hockey with the Special Olympics.  (Tr. 22).  She has made friends through the Special Olympics and through Arkay. (Tr. 22, 51).  She hangs out with them at the movies and at the mall.[8]  (Tr. 22, 51).

Smith uses a computer.  (Tr. 23).  She uses social media, like MySpace and Facebook. (Tr. 23, 724).  She also plays video games.  (Tr. 50).  She doesn't like to read; she testified that she can read and write but doesn't comprehend what she reads.  (Tr. 23-24).  But she plays cards and understands what they say.  (Tr. 24).

2.    *Smith's Mother's Third Party Reports and Testimony*

Smith's mother, Denise Smith, testified that Smith has always lived with her (Tr. 151, 731) and that she and her husband have legal guardianship of Smith, with Smith's younger sister

---

[7] During the 2008 hearing, Smith's mother characterized her as a "good driver" who drives slowly and memorizes directions.  (Tr. 45).  Initially, though, Smith was afraid to drive and had to take the driver's test several times before she passed.  (Tr. 158).

[8] During the 2008 hearing, Smith's mother added that she and her friends go to each other's houses, get lunch, go to a show, and go for walks.  (Tr. 51).

being her backup guardian.[9]  (Tr. 29, 734).  In her mother's opinion, Smith is not ready to live on her own.  (Tr. 26-27).

Smith's mother testified that Smith uses an alarm clock to wake up in the morning and that she knows how to program it.  (Tr. 731).  On days Smith works, she showers and goes to work, and after work, she visits her grandparents or friends.  (Tr. 151, 155).  On days that she does not work, she does her chores, showers, and visits her grandparents or friends.  (*Id.*).  Her chores include cleaning her room (she needs help making her bed), vacuuming, dusting, taking the garbage out, and loading and unloading the dishwasher.  (Tr. 153).  Smith does not care for other people or animals.  (Tr. 152).  She goes outside every day by foot or by car and does not need to be accompanied.  (Tr. 154-55).

Smith's mother reported that Smith does not finish what she starts.  (Tr. 156).  According to her mother, Smith has trouble following instructions and understanding tasks.  (Tr. 156, 158).  She can follow written and spoken instructions if they are easy.  (Tr. 156).  Her attention span depends on the subject; if it is too advanced, she loses attention "immediately."  (*Id.*).  She can handle changes in routine if they are "explained well enough to her."  (Tr. 157).

Smith's mother testified that she requested that an Arkay representative come to their house to teach Smith how to do laundry, cook, and count money.  (Tr. 733).  She said that Smith "doesn't really do laundry," but later, said Smith "occasionally" does laundry.  (Tr. 27, 735).  She pointed out that Smith prepares her own meals daily but is limited to making soups, sandwiches, and frozen dinners because she doesn't actually cook.[10]  (Tr. 26-27, 153, 735).  Her

---

[9] Smith's mother testified that she believes Smith needs a guardian to manage her finances "and to make sure she is taken care of and fed."  (Tr. 735).

[10] Smith's mother explained that a few times, Smith put Ramen noodle soup in the microwave with no water, causing the microwave to catch fire.  (Tr. 26-27, 735).  This happened after someone tried to show her how to do it.  (Tr. 735).

mother testified that she is working on teaching Smith how to manage her money; Smith is not capable of handling her finances and does not pay her own bills. (Tr. 26, 154, 735). Once a month, Smith shops in stores for items like clothes and shoes. (Tr. 154).

Although Smith's mother indicated that Smith has no problems with personal care (Tr. 152), she testified that Smith needs to be reminded to shower, use deodorant, brush her teeth and hair, and take her medication. (Tr. 26, 153, 158). She also needs to be reminded every week to do her chores, go to work, and go to doctor's appointments. (Tr. 153, 155). Her hobbies include watching television, playing card games and playing sports on a Special Olympic team – namely, bowling, floor hockey, basketball, and softball. (Tr. 155, 739).

Smith's mother reported that Smith spends time with others, but she has trouble getting along with her friends because they are "[a]lways fighting." (Tr. 155-56). Moreover, her mother said Smith has trouble with social skills and that she is more comfortable with individuals "much younger than her." (Tr. 156, 158). At the same time, she reported that Smith gets along "well" with authority figures and has never been fired because of problems getting along with other people. (Tr. 157). Smith has made a couple of friends at Arkay, who her mother believes have the same level of intellectual functioning as Smith. (Tr. 738-39). Smith's mother reported that Smith sees her friends a couple of times a week. (Tr. 739). Smith's mother expressed concern that Smith's friends were taking advantage of her. (Tr. 735).

According to Smith's mother, Smith started seeing a doctor for depression in 2006. (Tr. 736). Smith's mother reported that she has had ups and downs with depression and was hospitalized a few times because she wanted to kill herself. (Tr. 158, 736, 738). In her mother's view, signs that she is still struggling with depression include: (1) mood swings, anger,

aggravation, and getting very upset and agitated (for example, starting to cry and getting very loud in public)[11]; and (2) being tired, sleeping a lot, and having little motivation.  (Tr. 736).

### 3.  Medical Evidence

The Court has thoroughly reviewed Smith's medical record.  In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 4.  Vocational Expert's Testimony

Pauline Pegram testified as an independent VE at the administrative hearing on September 15, 2014.  (Tr. 740-44).  The VE characterized Smith's past relevant work as a fast-food worker as light in exertion level, unskilled in nature according to the Dictionary of Occupational Titles ("DOT"), and with a Specific Vocational Preparation ("SVP") of level 2. (Tr. 740-41, 997).  As for Smith's past relevant work as a sandwich board carrier, the VE characterized this as light according to the DOT, with a SVP of level 1.  (Tr. 741).

The ALJ asked the VE to imagine a hypothetical individual of Smith's age, education, and work experience that could work at all levels of exertion but was limited to simple, routine, repetitive, non-tandem tasks without strict production demands; and occasional interaction with coworkers and the general public.  (Id.).  The VE testified that the hypothetical individual would be capable of performing Smith's past work as a sandwich board carrier, but not as a fast-food worker, which "obviously requires more tandem work with . . . colleagues, and clearly a lot of public contact."  (Tr. 742).  The VE testified that there were also other occupations that the hypothetical individual could perform that were consistent with the DOT, for example:  cleaner housekeeper, laundry worker, and advertising material distributor.  (Id.).

---

[11]  Smith's mother reported that this happens a couple of times every week with both family members and non-family members.  (Tr. 736).

The ALJ then asked the VE to imagine a hypothetical individual with the same limitations as in the previous hypothetical but with occasional verbal or demonstration reminders with the introduction of new tasks; and occasional to superficial interaction with the general public.  (*Id.*).  The VE testified that the hypothetical individual would still be able to perform the jobs she had previously listed because those jobs are repetitive in nature, so the introduction of new tasks would not be that frequent.  (Tr. 743).

Next, the ALJ asked the VE to imagine a hypothetical individual with the same limitations as in the previous example, but who would be off task twenty-five percent of the workday, excluding normal breaks, due to lack of concentration and the effects of medication.  (*Id.*).  The VE testified that the hypothetical individual would not be able to perform the past work, the jobs she had listed, or any other work.  (*Id.*).

D.    **The ALJ's Findings**

At Step One of the five-step sequential analysis, the ALJ found that Smith did not engage in substantial gainful activity since July 26, 2006 (her application date and amended alleged onset date).  (Tr. 640-41).  At Step Two, the ALJ found that Smith has the severe impairment of borderline intellectual functioning.  (Tr. 641-42).  At Step Three, the ALJ found that Smith's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 642-43).  The ALJ then found that Smith retains the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations:  she is limited to simple, routine, repetitive, non-tandem tasks without strict production requirements.  (Tr. 643).  She is further limited to only occasional interaction with co-workers; and occasional to superficial interaction with the general public.  (Tr. 644).  She would also need occasional verbal or demonstration reminders with the introduction of new

tasks.  (*Id.*).

At Step Four, the ALJ concluded, based in part on the VE's testimony, that Smith has no past relevant work.  (Tr. 648).  At Step Five, the ALJ found that considering Smith's age, education, work experience, and RFC, she can perform the following unskilled jobs that exist in significant numbers in the national economy:  house cleaner (2,100 jobs in Michigan, 99,100 jobs nationally); laundry worker (3,900 jobs in Michigan, 185,000 jobs nationally); and advertising material distributor (2,000 jobs in Michigan, 45,600 jobs nationally).  (Tr. 648-49).  As a result, the ALJ concluded that Smith is not disabled under the Act.  (Tr. 649).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide

12

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

## F.     Analysis

In her motion for summary judgment, Smith advances four arguments regarding the ALJ's findings: (1) the Step Three finding regarding Listing 12.05 warrants remand; (2) the RFC is not supported by the record; (3) the credibility determination is not supported by

13

substantial evidence; and (4) the Step Five finding is erroneous. Smith's Step Three argument is potentially dispositive because a claimant whose impairments meet or medically equal the criteria of a Listing is presumed to be under a disability and is granted benefits without further evaluation. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 649 (6th Cir. 2006) (en banc). As set forth in greater detail below, the Court finds that remand is necessary so the ALJ may make a proper determination as to whether Smith meets Listing 12.05(C)'s requirements.[12]

       1.    *Listing 12.05(C)'s Requirements*[13]

Listing 12.05 covers intellectual disability[14] and "describes circumstances in which [it] is severe enough to preclude gainful activity." *Turner v. Comm'r,* 381 F. App'x 488, 491 (6th Cir. 2010). Smith challenges the ALJ's conclusion that she does not meet the criteria of Listing 12.05(C),[15] which provides, in relevant part:

---

[12] Because the Court is recommending remand based on the ALJ's failure to fully evaluate whether Smith meets Listing 12.05(C), the Court will focus its analysis on this particular issue. On remand, however, the ALJ should consider the impact that all of Smith's physical and mental impairments have on her ability to function in the workplace on an ongoing, full-time basis.

[13] The current version of Listing 12.05 became effective on January 17, 2017. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.05. However, the Social Security Administration "expect[s] that Federal courts will review [its] final decisions using the rules that were in effect at the time [it] issued the decisions." *See* 81 FR 66138-01, 2016 WL 5341732, at *66138 n.1 (Sept. 26, 2016). Here, the salient decision was issued on October 24, 2014. (Tr. 649). Accordingly, the Court will apply the requirements of Listing 12.05 that were in effect at that time.

[14] On September 3, 2013, the term "intellectual disability" replaced "mental retardation" in the Social Security Administration's Listing of Impairments. *See* 78 FR 46499-01, 2013 WL 3936340, at *46499 (Aug. 1, 2013).

[15] Smith also challenges the ALJ's conclusion that she does not meet Listings 12.05(A) and (D). Starting with Listing 12.05(A), the Court agrees with the Commissioner that "[t]he mere presence of IQ scores [in the record] precludes" Smith from meeting this criteria. (Doc. #26 at 13); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(D)(6)(b), *effective Feb. 26, 2014 to Dec. 8, 2014* ("Listing 12.05A may be the basis for adjudicating cases where the results of standardized intelligence tests are unavailable, e.g., where your condition precludes formal standardized

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\*       \*       \*

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.05(C), *effective Feb. 26, 2014 to Dec. 8, 2014*.

Therefore, in order to satisfy Listing 12.05(C), Smith must show:  (1) that she experiences

significantly subaverage general intellectual functioning with deficits in adaptive functioning

---

testing.").  The record contains Smith's IQ scores from 2006 and 2007, which means that the results of standardized intelligence tests are not "unavailable."  (Tr. 505, 511, 577, 616).

On remand, however, the ALJ should conduct a more thorough review of the evidence relevant to Listing 12.05(D).  In particular, the ALJ should consider the extent to which Smith's limitations interfere with her ability to function "*independently*, appropriately, effectively, and on a sustained basis" because portions of the record indicate that Smith needs assistance and reminders when carrying out tasks at home and at work.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(C), *effective Feb. 26, 2014 to Dec. 8, 2014* (citing 20 C.F.R. §§ 404.1520a, 416.920a) (emphasis added); (*See, e.g.*, Tr. 20, 24-26, 153, 155, 158, 504, 509, 619, 621-24, 724-27).  In assessing Smith's activities of daily living, the ALJ should consider Smith's "overall situation" and discuss her degree of independence and ability to initiate and participate in activities "independent of supervision or direction."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(C)(1), *effective Feb. 26, 2014 to Dec. 8, 2014*.  In evaluating Smith's concentration, persistence, or pace, the ALJ should consider how "independently" Smith is able to complete tasks, at what pace, and with what extent of "extra supervision or assistance."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(C)(3), *effective Feb. 26, 2014 to Dec. 8, 2014*.  The ALJ should assess Smith's concentration by reviewing results from mental status examinations, such as the one performed by Hugh D. Bray, Ph.D.  *Id.*; (Tr. 510).  Moreover, in evaluating this Listing generally, the ALJ should consider Smith's "work attempts."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(D)(3), *effective Feb. 26, 2014 to Dec. 8, 2014*.  She should focus on "circumstances surrounding the termination" of her work – her dishwashing job, for example – and the degree to which she requires "special supports . . . in order to work," such as her enrollment in Arkay and her reliance on a job coach.  *Id.*; (*see* Tr. 621).  The ALJ's factually-supported conclusions on these issues should be specific and contain clear citations to the record, including references to pertinent examinations and findings.  20 C.F.R. § 416.920a(e)(4).

initially manifested prior to age 22 (i.e., the diagnostic description); (2) that she has a "valid verbal, performance, or full scale IQ of 60 through 70"; and (3) that she suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 697-98 (6th Cir. 2007); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010) (internal citations omitted); *Hunt v. Comm'r of Soc. Sec.*, No. 06-15524, 2008 WL 2095258, at *5 (E.D. Mich. May 16, 2008) ("[I]t is not enough for plaintiff to satisfy paragraph C of 12.05; he must also satisfy the 'diagnostic description' [at the beginning of] Listing 12.05."); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(A), *effective Feb. 26, 2014 to Dec. 8, 2014* ("If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.").

> 2.   *The ALJ's Conclusion that Smith Does Not Meet the Criteria of Listing 12.05(C) is Not Supported by Substantial Evidence*

The ALJ found that Smith had a valid full scale IQ of 66 and 69, which satisfies the second of the three criteria set forth above. (Tr. 642) (citing Tr. 505, 616). However, the ALJ concluded that Smith did not meet Listing 12.05(C)'s requirement that she has a "physical or other mental impairment imposing an additional and significant work-related limitation of function." (*Id.*). Smith asserts that this was error because "the evidence supports that [her] depression/dysthymia/explosive disorder was 'severe.'" (Doc. #22 at 16). In addition, Smith points out that the ALJ "makes *no* mention of the introductory paragraph of [Listing] 12.05" (i.e., whether she exhibited the requisite deficits in adaptive functioning prior to age 22). (*Id.* n.2) (emphasis in original). The Court agrees that remand is appropriate.

> a.   *Other Physical or Mental Impairments*

As discussed above, to meet Listing 12.05(C)'s third element, Smith must show the

existence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.05(C), *effective Feb. 26, 2014 to Dec. 8, 2014*.  In a circular and conclusory fashion, the ALJ wrote that Smith does not satisfy this criteria because "the record does not demonstrate a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (Tr. 642).  This one-sentence conclusion is flawed.

As this Court recently explained:

> The additional impairment required at this stage of the analysis "need not be disabling in and of itself," but the Social Security regulations explain that it must be "a 'severe impairment, as defined in §§404.1520(c) and 416.920(c).'"  **Based on this regulation, an impairment that is deemed "severe" under 20 C.F.R. §416.920(c) necessarily constitutes a significant additional limitation.   Therefore, this prong of the paragraph C criteria is met if the ALJ finds, at Step 2 of the sequential disability analysis, that the claimant suffers from a severe physical or mental impairment that is distinct from the claimant's low IQ.**

*Hutchinson v. Comm'r of Soc. Sec.*, No. 12-11337, 2013 WL 4604561, at *15 (E.D. Mich. Aug. 29, 2013) (internal citations omitted) (emphasis added); *see also Hunt*, 2008 WL 2095258, at *5.  Here, the ALJ found at Step Two that Smith has a severe impairment of borderline intellectual functioning[16] but that the following conditions were non-severe:  history of infected great toe, ear infections, speech delay, intermittent explosive disorder, and dysthymia.  (Tr. 641).  The ALJ reviewed the evidence in the record when she explained why great toe infection, speech delay, and dysthymia were not severe impairments.  (Tr. 641-42).  However, she completely failed to

---

[16] Borderline intellectual functioning is not "distinct from [Smith's] low IQ," and therefore, it does not satisfy this prong of paragraph C.  *Hutchinson v. Comm'r of Soc. Sec.*, No. 12-11337, 2013 WL 4604561, at *15 (E.D. Mich. Aug. 29, 2013).

address Smith's intermittent explosive disorder.[17]   Apart from listing it as a condition at the beginning of Step Two, the ALJ did not mention it in her analysis of Smith's conditions and thus did not explain why it was non-severe and caused "no ongoing significant symptoms or limitations."  (Tr. 641).

The record contains references to Smith's intermittent explosive disorder that the ALJ should have expressly considered.  For example, on three separate occasions – in September 2006, December 2006, and March 2007 – Katherine Ransome, MSW,[18] noted that Smith had a history of intermittent explosive disorder, was easily angered, and had "poor management of stressors or triggers."  (Tr. 583, 585, 587).  On October 2, 2007, Elizabeth Paddock, MSW, noted that Smith was "[e]asily irritated."  (Tr. 580).  On October 24, 2007, Linda Shu, M.D., diagnosed Smith with intermittent explosive disorder and noted that she was taking Zoloft.  (Tr. 603-04).  In addition, notes by Paddock from November 8, 2007, indicate that Smith ran away from home because she was "too angry" to wait to talk to her parents about a certain issue not disclosed in the record.  (Tr. 573).  Paddock wrote that she counseled Smith on not making important decisions when she was angry, reinforced calming down and having a rational discussion before making rash decisions, and discussed positive coping skills for reducing anger.  (*Id.*).  Thus, the record shows that Smith was diagnosed with – and was receiving treatment for – intermittent explosive disorder during the time frame at issue.  While "the mere diagnosis of an impairment does not render an individual disabled nor . . . reveal anything about the limitations, if any, it imposes upon an individual," *McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680

---

[17] The ALJ also failed to explain why Smith's ear infections were not severe.  But Smith does not raise this in her motion and nothing in the record suggests that further consideration is warranted on this issue.

[18] Social Security Administration regulations provide that evidence from social workers may be considered in evaluating a mental disorder.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(C).

at *5 (6th Cir. May 19, 2000), the ALJ should have considered this evidence in making her Step Two determination, which played a crucial role in her analysis at Step Three of whether Smith met the requirements of Listing 12.05(C).

The Commissioner does not argue that the ALJ appropriately reviewed the evidence regarding Smith's intermittent explosive disorder in her Step Two evaluation. (Doc. #26 at 11). Instead, the Commissioner simply states that paragraph C was not met because "the ALJ properly found other impairments, including dysthymia, to be non-severe." (*Id.* at 14). But the Commissioner does not explain why the ALJ's finding was "proper" and instead simply states that Smith "has not shown that the ALJ erred in declining to find [that intermittent explosive disorder] constituted a severe impairment." (*Id.* at 11). While Smith's brief does focus more on the evidence regarding dysthymia, in light of the record evidence discussed above, the ALJ still should have expressly addressed Smith's intermittent explosive disorder in her decision.

The Court cannot say that this error was harmless. Based on the Social Security Administration's own regulations, "an impairment that is deemed 'severe' necessarily constitutes a significant additional limitation" for purposes of a Listing 12.05(C) analysis. *Hutchinson*, 2013 WL 4604561, at *15; *see also Oddo v. Astrue*, 2012 WL 7017622, at *4 (N.D. Ohio Dec. 10, 2012). If Smith's intermittent explosive disorder were found to be severe, this would satisfy the "other physical or mental impairment" criteria of Listing 12.05(C). Thus, the case should be remanded for evaluation of the severity of Smith's intermittent explosive disorder. *Reynolds v. Comm'r of Soc. Sec.,* 424 Fed. Appx. 411, 416 (6th Cir. 2011) (finding that where an ALJ failed to properly evaluate a Listing, "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence" and therefore remanding the case for a Listing evaluation that discusses the evidence and explains the reasoning for the determination).

b.    *The Diagnostic Description*

As set forth above, the introduction to Listing 12.05 states: "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05, *effective Feb. 26, 2014 to Dec. 8, 2014*. The ALJ's decision fails to mention this element of the Listing. The Commissioner does not discuss this omission in her brief and instead simply argues that "the ALJ properly explained why each of [the paragraph A, C, and D] criteria was not met." (Doc. #26 at 12).

The ALJ's decision is deficient because at no point does she discuss whether Smith meets Listing 12.05's diagnostic description. Without explicitly making the required finding at this initial stage, the ALJ simply proceeded to discuss the criteria for paragraphs A through D. (Tr. 642-43). Therefore, it is unclear whether the ALJ implicitly found that Smith met the requirements of the introductory paragraph or whether she believed that Smith had no significant deficits in adaptive functioning. As another court faced with a similarly silent "analysis" of this Listing's diagnostic description held, courts "cannot assess whether a finding that [the claimant] does not meet the introductory paragraph is supported by substantial evidence [when] there is no finding by the ALJ on this issue." *Hutchinson*, 2013 WL 4604561, at *14 (citing *Peck v. Barnhart*, 214 F. App'x 730, 736 (10th Cir. 2006)).

Again, the error is not harmless. The record contains evidence of deficits in "adaptive functioning" – which includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills – prior to age 22. *See West*, 240 F. App'x at 698; *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) (citing *Heller v. Doe,* 509 U.S.

312, 329 (1993)).  For example, Smith received special education services throughout high school, which is evidence of a significant deficit in her functional academic skills.  (*See, e.g.,* Tr. 189-97, 213-24, 238, 229-37, 239-47, 248-59, 260-65, 273-84, 285-96, 299-302, 304-09, 310-13, 325-40, 346-56, 359-66, 375-83, 432-36); *see Breitenstein v. Astrue*, 2011 WL 1235018, at *13 (S.D. Ohio Jan. 6, 2011) (finding deficits in functional academic skills relevant in determining whether claimant has a deficit in adaptive functioning).  Moreover, Smith has never lived independently, which further evidences deficits in adaptive functioning.  (Tr. 151, 614, 731).  In addition, the record indicates that she needs help with financial matters (Tr. 615, 619) and reminders and assistance with personal grooming, hygiene, and taking her medication.  (Tr. 509, 580-81, 585, 616, 619, 623-24).  She also has some trouble making and getting along with friends.  (Tr. 155-56, 507, 512, 571-72, 575, 578, 614).

In this case, as in *Hutchinson*, 2013 WL 4604561, because the ALJ's decision is silent on this issue, it is unclear whether she conducted the analysis required at the initial step.  Accordingly, the case must be remanded for the ALJ to properly consider whether Smith satisfies the diagnostic description of Listing 12.05.  *See Peck*, 214 F. App'x at 736 ("If [the claimant] does not meet the capsule definition [in the introductory paragraph], then the ALJ must make that determination in the first instance.").

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is not supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **[26]** be **DENIED**, Smith's Motion for Summary Judgment seeking remand **[22]** be **GRANTED**, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case

be **REMANDED** to the ALJ for further proceedings consistent with this R&R.

Dated: January 31, 2017                    s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 31, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager